## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

AMERICA FIRST INSURANCE COMPANY;
AMERICAN FIRE AND CASUALTY
COMPANY; AMERICAN STATES
INSURANCE COMPANY; AMERICAN
STATES PREFERRED INSURANCE
COMPANY; EMPLOYERS INSURANCE
COMPANY OF WAUSAU; EXCELSIOR
INSURANCE COMPANY; FIRST NATIONAL
INSURANCE COMPANY OF AMERICA;
HELMSMAN MANAGEMENT SERVICES
LLC; LIBERTY COUNTY MUTUAL
INSURANCE COMPANY; LIBERTY
INSURANCE CORPORATION; LIBERTY
MUTUAL FIRE INSURANCE COMPANY;
LIBERTY MUTUAL INSURANCE COMPANY;
LIBERTY MUTUAL MID ATLANTIC
INSURANCE COMPANY; LM INSURANCE
CORPORATION; LM GENERAL INSURANCE
COMPANY; LM PROPERTY AND CASUALTY
INSURANCE COMPANY; OHIO SECURITY
INSURANCE COMPANY; PEERLESS
INDEMNITY INSURANCE COMPANY;
PEERLESS INSURANCE COMPANY; SAFECO
INSURANCE COMPANY OF AMERICA;
SAFECO INSURANCE COMPANY OF
ILLINOIS; SAFECO INSURANCE COMPANY
OF INDIANA; SAFECO INSURANCE
COMPANY OF OREGON; THE FIRST
LIBERTY INSURANCE CORPORATION; THE
NETHERLANDS INSURANCE COMPANY;
THE OHIO CASUALTY INSURANCE
COMPANY; WAUSAU UNDERWRITERS
INSURANCE COMPANY; and WEST
AMERICAN INSURANCE COMPANY,

Plaintiffs

vs.

ELECTROSTIM MEDICAL SERVICES, INC.
and MARIO GARCIA, JR.,

Defendants

**CIVIL ACTION**

**No. 8:22-cv-1517**

**JURY TRIAL
DEMANDED**

# **COMPLAINT**

Plaintiffs, AMERICA FIRST INSURANCE COMPANY; AMERICAN FIRE AND CASUALTY COMPANY; AMERICAN STATES INSURANCE COMPANY; AMERICAN STATES PREFERRED INSURANCE COMPANY; EMPLOYERS INSURANCE COMPANY OF WAUSAU; EXCELSIOR INSURANCE COMPANY; FIRST NATIONAL INSURANCE COMPANY OF AMERICA; HELMSMAN MANAGEMENT SERVICES LLC; LIBERTY COUNTY MUTUAL INSURANCE COMPANY; LIBERTY INSURANCE CORPORATION; LIBERTY MUTUAL FIRE INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; LIBERTY MUTUAL MID ATLANTIC INSURANCE COMPANY; LM INSURANCE CORPORATION; LM GENERAL INSURANCE COMPANY; LM PROPERTY AND CASUALTY INSURANCE COMPANY; OHIO SECURITY INSURANCE COMPANY; PEERLESS INDEMNITY INSURANCE COMPANY; PEERLESS INSURANCE COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; SAFECO INSURANCE COMPANY OF ILLINOIS; SAFECO INSURANCE COMPANY OF INDIANA; SAFECO INSURANCE COMPANY OF OREGON; THE FIRST LIBERTY INSURANCE CORPORATION; THE NETHERLANDS INSURANCE COMPANY; THE OHIO CASUALTY INSURANCE COMPANY; WAUSAU UNDERWRITERS INSURANCE COMPANY; and WEST AMERICAN INSURANCE COMPANY, individually and doing business under the trade name of "Liberty Mutual Insurance," (hereinafter "Plaintiffs" or "Liberty Mutual"), by and through their attorneys,

bring this action against the Defendants, ELECTROSTIM MEDICAL SERVICES, INC. ("EMSI") and MARIO GARCIA, JR., and allege claims for DECLARATORY JUDGMENT (22 U.S.C. §§ 2201, *et. seq.),* RESTITUTION, FEDERAL RICO ACT 18 U.S.C. § 1962 (c), RICO CONSPIRACY VIOLATION 18 U.S.C § 1962 (d), FLORIDA RICO VIOLATION OF FLA. STAT. §772.103, VIOLATION OF FLA. STAT. §501.201 et. sec., FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA COMMON LAW FRAUD, and UNJUST ENRICHMENT. In support of their claims, Plaintiffs state as follows:

## I.   <u>INTRODUCTION</u>

1.    This case involves a scheme by the Defendants to defraud the Plaintiffs out of money through the submission of fraudulent insurance claims.

2.    Defendants' Florida business submitted claims based on false, misleading, and improper use of Current Procedural Terminology ("CPT") Codes.

3.    Defendants automatically provided initial supplies and re-supplies to injured persons but materially misrepresented the services provided, induced payment, and intentionally charged in excess of the services and in contradiction to the CPT codes ("Scheme to Defraud Plaintiffs").

4.    EMSI is incorporated in the State of Florida and its business includes providing medical equipment, supplies, and resupplies to claimants/patients ("Patients"), including those in Florida and other states.

EMSI is authorized to conduct business in all states, including Florida. EMSI's principal place of business is at address 3504 Cragmont Drive, Suite 100, Tampa, Florida 33619. EMSI's registered agent is Mario Garcia, Jr., whose address is 3605 Cragmont Drive, Suite 100, Tampa, Florida 33619.

5.     Defendant, Mario Garcia, Jr., ("Mr. Garcia") founded EMSI in approximately 1995. During all times stated herein, he was and remains the owner, CEO, President, Chairman, employee, agent, and a shareholder of EMSI.

6.     Mr. Garcia is a citizen of the State of Florida. He is not known to be licensed to practice medicine nor is he licensed by any healthcare profession.

7.     During all relevant times, EMSI provided equipment to Patients including but not limited to Patients insured by Plaintiffs, as well as Patients employed by employers insured by Plaintiffs (including those identified herein).

8.     Before Plaintiffs filed this action, Plaintiffs discovered that EMSI was previously sued for substantially identical schemes to defraud, including:

  a. United States District Court for the Eastern District of New York. See Exhibit 1;

  b. United States District Court for the Middle District of Florida, Tampa Division, Case No: 8:06-cv-00014-SCB-TBM. See Exhibit 2 (Counterclaim filed by Allstate against EMSI);

  c. United States District Court for the Eastern District of Pennsylvania, Case No: 2:18-cv-01410-ER. See Exhibit 3

(Amended Complaint filed by Nationwide Insurance against EMSI and Mr. Garcia).

9.      In the Nationwide and Allstate actions, which involve substantially identical schemes to defraud, the Complaints alleged that (a) Mr. Garcia was the CEO of EMSI and he formed EMSI for the purpose of distributing and dispensing medically unnecessary DMEs and supplies. See, e.g., Exhibit 2 at ¶297; Exhibit 3 at ¶8. They also alleged (b) the fraudulent conduct of all defendants, including Mr. Garcia and EMSI, was so extensive that it demonstrated a high degree of moral turpitude and wanton dishonesty, thereby entitling plaintiffs in those cases to punitive damages. See Exhibit 2 at ¶234. Exhibit 3 at ¶8.

10.      EMSI settled the Aetna action. Both EMSI and Mr. Garcia settled the Allstate and Nationwide actions. See Exhibits 4, 5, and 6.

11.      Given the substantially identical multiple prior legal actions against EMSI, including those in which Mr. Garcia was sued personally, it is clear that Mr. Garcia, as EMSI's founder, owner, President, Chairman, and CEO, was personally aware and on notice of these prior lawsuits and the allegations against EMSI's unlawful practices therein.

12.      Having been put on notice, Mr. Garcia knew, or should have known, of EMSI's ongoing Scheme to Defraud Plaintiffs.

13.      It is clear that Mr. Garcia not only had personal knowledge of, but

also had direct involvement and participation in and ratified, EMSI's Scheme to Defraud Plaintiffs, based on the widespread nature of EMSIs' fraudulent activities, involving multiple insurance companies and patients from across the country.

14.    At all times relevant and stated herein, Mr. Garcia knew, or reasonably should have known, about the fraudulent actions of EMSI, but nevertheless implemented and/or otherwise ratified this scheme to defraud insurance companies to profit from these types of fraudulent practices.

15.    Mr. Garcia has personally participated in EMSI's fraudulent billing activities, and his name has appeared on EMSI bills submitted to other insurance carriers. See Exhibit 3 at ¶14 (said Exhibit 3 refers to an Exhibit 21, which is attached hereto as Exhibit 7).

16.    Mr. Garcia was directly involved and orchestrated, controlled, and directed the Scheme to Defraud Plaintiffs. Alternatively, Mr. Garcia was grossly negligent and derelict in his duties, having been put on notice and having personal knowledge of the Scheme to Defraud Plaintiffs. Thus, he was complicit, ratified the scheme by his actions and/or inactions, and as such he is directly liable to Plaintiffs for his acts and omissions in connection with Defendants' Scheme to Defraud Plaintiffs.

17.    Mr. Garcia is also personally liable for his own actions and omissions with regard to the Scheme to Defraud Plaintiffs.

18.     Prior to filing this action, Plaintiffs attempted to resolve this matter with Defendants, who denied the allegations and argued their billing was appropriate. After investigating all of Defendants' arguments and claims, it was determined on September 27, 2021 that Defendants' arguments are false and without merit, therefore leading to the instant lawsuit.

19.     It was not until that time, September 27, 2021, that the pattern and fraudulent motive of the Defendants was discovered and became known.  For example, and without limitation, the pattern of Defendants reporting the replacement of durable items such as lead-wires, battery chargers, and rechargeable batteries could not have been discovered without analysis of the claims universe and data contained therein.

20.     The necessary information to support the claims against Mr. Garcia can easily be inferred based upon the above facts, given the widespread, pervasive, and prevalent nature of the Scheme to Defraud Plaintiffs, and also based upon the additional facts alleged throughout the remainder of this Complaint, and exhibits attached to the same, which confirm Mr. Garcia's notice, personal knowledge, involvement, participation, and scienter regarding the Scheme to Defraud Plaintiffs.

21.     Alternatively, the additional facts necessary to support the claims asserted in this Complaint against Mr. Garcia have been intentionally concealed by him and by his company, EMSI. This necessary information lies in

Defendants' exclusive control and has not been made available to Plaintiffs.

22.     EMSI's concurrent substantially identical fraudulent conduct (See Exhibits 1-3), which has been taking place in multiple states, further indicates and evidences the overall rampant nature and pervasiveness of Defendants' Scheme to Defraud Plaintiffs.

23.     EMSI's concurrent conduct in multiple states further indicates and evidences EMSI's knowledge of the proper and correct way to code; however, EMSI selectively, intentionally, and fraudulently billed in a concerted effort to obtain monies it was not entitled to as part of Defendants' Scheme to Defraud Plaintiffs.

24.     EMSI is directly liable for its own actions and omissions with regard to the Scheme to Defraud Plaintiffs.

25.     EMSI is also vicariously liable for the acts and omission of its employees and agents, including but not limited to Mr. Garcia, with regard to the Defendants' Scheme to Defraud Plaintiffs.

26.     Despite being on notice, Defendants continue to knowingly engage in the same fraudulent conduct, including issuing false and fraudulent invoices to Plaintiffs from Florida and accepting payment in Florida.

27.     As a result of Defendants' Scheme to Defraud Plaintiffs, Plaintiffs have incurred significant investigative costs, including but not limited to costs associated with expert retention and services and hiring counsel to investigate

and review the Defendants' Scheme to Defraud Plaintiffs and file this lawsuit, thereby entitling Plaintiffs to recover all investigative and litigation costs and fees, including attorneys' fees incurred to date.

28.    Plaintiffs are also entitled to recover all future ongoing investigative costs, litigation costs, and counsel fees incurred in bringing and litigating this action.

29.    The Plaintiffs are Underwriting Companies which do business under the trade name of Liberty Mutual Insurance.

30.    Plaintiffs    provided    benefits    for    workers    compensation claimants/petitioners who received items from Defendants after alleged work related injuries resulted in workers compensation claims against their respective employers, who were insured by Plaintiffs.  Plaintiffs were also obligated to pay pursuant to policies of insurance for personal injury after occurrences resulting in personal injury claims.

31.    Pursuant to their obligations as insurers for those employers and/or in paying benefits for injured persons, the Plaintiffs paid bills and charges submitted to them in reliance on the accuracy of the information submitted by Defendants in connection with those claims and submissions.

32.    Investigation by the Plaintiffs, by and through Liberty Mutual Insurance, has revealed fraudulent deviations from proper coding rules that have resulted in substantial overpayments to the Defendants.

33.   The Plaintiffs are as follows:

a. AMERICA FIRST INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

b. AMERICAN FIRE AND CASUALTY COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

c. AMERICAN STATES INSURANCE COMPANY is a company organized under the laws of the State of Indiana and authorized to conduct business and write insurance policies in the states alleged herein.

d. AMERICAN STATES PREFERRED INSURANCE COMPANY is a company organized under the laws of the State of Indiana and authorized to conduct business and write insurance policies in the states alleged herein.

e. EMPLOYERS INSURANCE COMPANY OF WAUSAU is a company organized under the laws of the State of Wisconsin and authorized to conduct business and write insurance policies in the states alleged herein.

f.  EXCELSIOR INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

g.  FIRST NATIONAL INSURANCE COMPANY OF AMERICA is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

h.  HELMSMAN MANAGEMENT SERVICES LLC is a company organized under the laws of the State of Massachusetts and authorized to conduct business and write insurance policies in the states alleged herein.

i.  LIBERTY COUNTY MUTUAL INSURANCE COMPANY is a company organized under the laws of the State of Texas and authorized to conduct business and write insurance policies in the states alleged herein.

j.  LIBERTY INSURANCE CORPORATION is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in the states alleged herein.

k.  LIBERTY MUTUAL FIRE INSURANCE COMPANY is a

company organized under the laws of the State of Wisconsin and authorized to conduct business and write insurance policies in the states alleged herein.

l.  LIBERTY MUTUAL INSURANCE COMPANY is a company organized under the laws of the State of Massachusetts and authorized to conduct business and write insurance policies in the State of Illinois.

m. LIBERTY MUTUAL MID ATLANTIC INSURANCE COMPANY is a company organized under the laws of the State of Massachusetts and authorized to conduct business and write insurance policies in the states alleged herein.

n.  LM INSURANCE CORPORATION is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in the states alleged herein.

o.  LM GENERAL INSURANCE COMPANY is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in the states alleged herein.

p.  LM PROPERTY AND CASUALTY INSURANCE COMPANY is a company organized under the laws of the State of Indiana

and authorized to conduct business and write insurance policies in the states alleged herein.

q. OHIO SECURITY INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

r. PEERLESS INDEMNITY INSURANCE COMPANY is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in the states alleged herein.

s. PEERLESS INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

t. SAFECO INSURANCE COMPANY OF AMERICA is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

u. SAFECO INSURANCE COMPANY OF ILLINOIS is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in

the states alleged herein.

v.  SAFECO INSURANCE COMPANY OF INDIANA is a company organized under the laws of the State of Indiana and authorized to conduct business and write insurance policies in the states alleged herein.

w.  SAFECO INSURANCE COMPANY OF OREGON is a company organized under the laws of the State of Oregon and authorized to conduct business and write insurance policies in the states alleged herein.

x.  THE FIRST LIBERTY INSURANCE CORPORATION is a company organized under the laws of the State of Illinois and authorized to conduct business and write insurance policies in the states alleged herein.

y.  THE NETHERLANDS INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

z.  THE OHIO CASUALTY INSURANCE COMPANY is a company organized under the laws of the State of New Hampshire and authorized to conduct business and write insurance policies in the states alleged herein.

aa. WAUSAU UNDERWRITERS INSURANCE COMPANY is a company organized under the laws of the State of Wisconsin and authorized to conduct business and write insurance policies in the states alleged herein.

bb. WEST AMERICAN INSURANCE COMPANY is a company organized under the laws of the State of Indiana and authorized to conduct business and write insurance policies in the states alleged herein.

## II.    **VENUE AND JURISDICTION**

34.    This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331 based on the federal of law at issue, including those brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

35.    This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332, based upon the diverse citizenship of the parties and the amount in controversy, which exceeds $75,000.00, exclusive of interest and costs.

36.    This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1367 based upon the pendent and ancillary jurisdiction of this Court.

37.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## III.   SCOPE OF DEFENDANTS' SCHEME TO DEFRAUD PLAINTIFFS

38.     Plaintiffs bring this Complaint to recover damages from Defendants, EMSI and Mr. Garcia, who knowingly defrauded Plaintiffs by committing fraudulent acts, including but not limited to, submitting false, misleading, and inaccurate bills and other documents, with the intention of inducing Plaintiffs to issue payment (and did actually induce payment), for medical equipment distributed and provided to Patients in Florida and elsewhere (Pennsylvania and Oklahoma). Exhibits 8-17 contain the Claim numbers, dates, amounts, and other data providing the factual basis supporting Plaintiffs' cause of action to place Defendants on notice of the conduct being alleged herein.

39.     As part of the Scheme to Defraud Plaintiffs, Defendants knew that Patients were placed on a standard and pre-determined DME treatment plan.

40.     Defendants' treatment plan knowingly involved the provision of and charges for DME devices, supplies and equipment, and the automatic generation of resupplies to Patients herein.

41.     Defendants' treatment plan involving DME devices, equipment and supplies, and automatically generated resupplies, was knowingly part of Defendants' Scheme to Defraud Plaintiffs.

42.     Defendants knowingly and intentionally used CPT Code E1399 when charging Plaintiffs for DME devices, which they knew was a false and

improper CPT code for the devices Defendants provided.

43.    Defendants also knowingly and intentionally unbundled items and improperly used CPT codes when charging Plaintiffs for the DME devices, which they knew were false, improper codes.

44.    Defendants knowingly and intentionally charged Plaintiffs for resupply items in a manner Defendants knew was false, improper, and fraudulent.

45.    Defendants knowingly and intentionally miscoded, up-coded, and/or unbundled CPT Codes for items and knowingly and intentionally accepted payments from Plaintiffs when Defendants knew such billing practices were false and improper and done to obtain monies Defendants were not lawfully entitled to receive.

46.    This Scheme to Defraud Plaintiffs was knowingly implemented by Defendants for their own financial benefit.

47.    The improper and fraudulent billing records submitted by Defendants to Plaintiffs were intended, and continue, to generate payment and induce payments from Plaintiffs.

48.    This Scheme to Defraud Plaintiffs was implemented by Defendants to support past and future billing of DME equipment and supplies to Plaintiffs in support of Patients' injury claims.

49.    As part of Defendants' Scheme to Defraud Plaintiffs, many of the

DME supplies billed were not provided as documented, while others were routinely dispensed without proper order by a medical physician.

50.   Defendants' widespread Scheme to Defraud Plaintiffs extended far beyond Florida and into multiple states throughout the country.

**A.   APPLICABLE STANDARDS**

51.   Common Procedural Technology ("CPT") codes are also referred to under and utilize Medicare's Healthcare Common Procedure Coding System ("HCPCS").

52.   CPT codes are used to determine the rates insurance carriers, in this case, Plaintiffs, are to be charged by DME providers, in this case, Defendants.

53.   All of the CPT billing codes that appear in the invoices Defendants sent to Plaintiffs were knowingly and intentionally selected by Defendants with the intent to defraud Plaintiffs.

54.   Defendants' selection of the CPT billing codes for each invoice and claim submitted to Plaintiffs was done with the knowledge, consent, ratification, direction and control of its founder and owner, Chairman, CEO, and President, Mr. Garcia.

**B.   BILLING CODES FOR TENS UNITS**

55.   A TENS unit is a device that is placed on a Patient's skin to provide transcutaneous electrical nerve stimulation ("TENS"). Both the EMSI Flex-TENS unit and the EMSI Flex-IT unit can be and are used as TENS units.

56.   During all relevant times, Defendants charged Plaintiffs for TENS

units, supplies and resupplies, which were purportedly ordered and prescribed by physicians.

57.    Defendants charged Plaintiffs for TENS units that included 4 lead Flex-IT or IF5000 TENS units and FLEX-MT or MT Plus (neuromuscular electrical stimulator ("NMES")) units.  Regardless of the unit, E1399 was never the correct code that should have been used – or charged – by the Defendants.

58.    Healthcare Common Procedure Coding System ("HCPCS") Code E1399 is found in the section of HCPCS that pertains to unlisted oxygen supply items and is described as follows: "Durable medical equipment, miscellaneous."

59.    Defendants directly charged Plaintiffs for the TENS units and did so by utilizing HCPCS E1399. EMSI represented to the Plaintiffs that E1399 was the proper code to use for billing its TENS or NMES units. Based on a review of the TENS and/or NMES units provided by Defendants, at no time was HCPCS E1399 the proper code for billing Defendants' TENS or NMES units. Rather, Defendants used this code in a Scheme to Defraud Plaintiffs into paying more than they would have if Defendants billed under the proper code for the devices provided.

60.    EMSI's website[1] indicates that EMSI currently supplies four (4) different electrical stimulation device products to consumers. The Flex-MT Plus

---

[1]    https://www.wecontrolpain.com/devices (last checked 6/13/22).

is classified by the FDA under pre-market clearance (510(K)) number K14067[2] as a powered muscle stimulator. Based on this classification, a FLEX-MT unit is correctly coded using HCPCS code E0745, which is described in HCPCS as follows: E0745 – Neuromuscular stimulator, shock unit.

61.     Other devices such as the Flex-IT, Flex-TENS and IF 5000 Combo are classified by the FDA under pre-market clearance (510(K)) numbers K083030[3], K090717[4] and K071869[5] respectively (the device names vary slightly between the published names on the EMSI website and the EMSI product names listed in the 510(K) database). Each is classified as a transcutaneous electrical nerve stimulator (TENS) and each has four (4) or more leads. Based on this classification, the FLEX-IT, FLEX-TENS and IF-5000 Combo devices are correctly coded using HCPCS E0730, which is described in HCPCS as follows: "Transcutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation."

62.     Defendants falsely and intentionally billed Plaintiffs for its units using HCPCS E1399.   Defendants, in fact, did bill the Plaintiffs E0730 (approximately 0.6% of the time) thereby showing their knowledge of the code; however, Defendants selectively chose to not use this code as it pays significantly

---

[2]   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K140467 (last checked 6/13/22).
[3]   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K083030 (last checked 6/13/22).
[4]   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K0907170 (last checked 6/13/22).
[5]   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=K071869 (last checked 6/13/22).

less than what Defendants were able to be paid when using E1399.

63.    Defendants represented to Plaintiffs that HCPCS E1399 was an appropriate code to utilize for its TENS/NMES units. Such representations were false and done in an effort to induce Plaintiffs to pay the higher amount of the E1399 code. Plaintiffs relied on those statements and made payments to Defendants for CPT code E1399.

64.    Instead, the TENS/NMES units herein should have been billed using HCPCS code E0730 or E0745. By falsely representing and charging the DME item supplied using the unlisted oxygen supply code (E1399), EMSI improperly obtained substantial additional reimbursements.

65.    The HCPCS manual is organized into sections and subsections based on the type of supply or DME items at issue. Stimulation devices are found in HCPCS in the following sections/sub-sections: Durable Medical Equipment E0100-E8002; Stimulation Devices E0720-E0770.

66.    For devices classified by the US Food and Drug Administration ("FDA") as TENS devices, the following HCPCS codes are appropriate: E0720 (Transcutaneous electrical nerve stimulation (TENS) device, two lead, localized stimulation) and E0730 (Transcutaneous electrical nerve stimulation (TENS) device, four or more leads, for multiple nerve stimulation).

67.    The appropriate HCPCS code for a 4 lead Flex-IT or IF5000 TENS unit, which is classified by the FDA as transcutaneous electric neuromuscular stimulation devices, is E0730.

68.   In cases where TENS use is anticipated beyond 12 months, it is appropriate to sell the device and, in such cases, a modifier NU is reported. Modifier NU designates delivery of a new unit.

69.   When used short-term (less than 12 months), TENS units are provided on a rental basis. In such cases, the modifier RR is reported indicating the rental of the device and one (1) unit of E0730-RR is billed for each month of rental use. Reimbursement is by fee schedule and is generally $1/10^{th}$ of the purchase price and includes any needed supplies for the device.  Once the device has been rented for 10 months, no further charge is permissible.

70.   Billing for the sale of a TENS device where rental is required based on the limited duration of use specified in the prescription/LMN is improper and results in substantial additional unentitled reimbursement.

71.   For devices classified by the FDA as NMES devices (Neuromuscular stimulator, electronic shock units), HCPCS code E0745 exists and is appropriate.

72.   The appropriate HCPCS code for a FLEX-MT or MT Plus, which is classified by the FDA as a NMES is HCPCS E0745. In cases where use is anticipated beyond 12 months, the device should be sold and reported with modifier NU (modifier NU designates delivery of a new unit). Where use is short-term (less than 10 months), the device is generally required to be provided on a rental basis. In such cases, the modifier RR is reported indicating the rental

of the device and one (1) unit of E0745-RR is billed for each month of rental use. Reimbursement is by fee schedule and is generally $1/10^{th}$ of the purchase price and includes any needed supplies for the device. Once the device has been rented for 10 months, no further charge is permissible.

73.    Billing the sale of a TENS device where rental is required based on the limited duration of use specified in the prescription/Letter of Medical Necessity is improper and results in substantial additional unentitled reimbursement.

74.    Defendants' use of HCPCS E1399 was and is not appropriate for provision of either a TENS or NMES unit.

75.    HCPCS E1399 is found in HCPCS under the following sections/sub-sections: Durable Medical Equipment E0100-E8002; Accessories for Oxygen Delivery Devices E1352-E1406.

76.    HCPCS E1399 is not an appropriate code to bill for an electrical stimulation device, especially considering that a valid HCPCS code exists.

77.    Defendants commonly provide the Flex-IT device, and in some cases either provide an IF5000 or a combo unit, which are also classified by the FDA as TENS units. As such, these devices would be appropriately billed using HCPCS E0730.

78.    Defendants improperly used HCPCS E1399 to bill for either of the FDA classified TENS and NMES devices Defendants provided to Patients herein

to obtain unentitled reimbursement.  Use of the proper HCPCS code would have resulted in a lower reimbursement amount based on the fee schedule amount allowed for the correct code.

79.    HCPCS E1399, while generically described as an unlisted DME item, is found in the section of HCPCS pertaining to oxygen equipment and supplies and is not appropriate for reporting other forms of DME especially when the DME item being supplied has a specific code.

80.    Defendants' improper and fraudulent billing of both TENS units and NMES devices under HCPCS E1399 allowed Defendants to bypass relevant fee schedules and obtain substantially higher, unentitled, reimbursements.  At no time was Defendants' use of HCPCS E1399 appropriate.

## C.    <u>SUPPLY, RESUPPLY ITEMS, AND OTHER FRAUDULENT CHARGES BY DEFENDANTS</u>

81.    As a general matter, and consistent with Centers for Medicare and Medicaid Services ("CMS") reimbursement policy, which is incorporated under the cost containment rules for the claims at issue herein, Defendants were required to maintain documentation proving delivery or receipt of the DME items or supplies it ostensibly provided and billed for.    Absent such documentation, which was not provided by the Defendants, Plaintiffs cannot ascertain whether the DME items or supplies they paid for were actually provided to the Patients.  Claims for items and supplies not actually provided are false claims for which Plaintiffs are entitled to complete recovery.

82.    Consistent with CMS guidance, initial supplies including electrodes, lead wires, batteries, re-chargers, alcohol wipes, etc. are included in the charges for TENS/NMES devices and are not separately billable. Separate reporting and billing of these supplies constitutes what is commonly known as impermissible fragmenting or unbundling. In fact, the initial supply items are packed with the TENS units by the manufacturers.

83.    Defendants actually had to unpack the initial supply items that came from the manufacturer with the TENS/NMES units in order to bill Plaintiffs' separately for a TENS/NMES unit plus each initial supply item, thus intentionally obtaining grossly inflated and unentitled reimbursements.

84.    A charge for HCPCS E0730 or E0745 contains all items needed for the first month of use by the Patient. If any additional needed items are needed after the first month, those are considered resupply items.

85.    Resupply of items such as electrodes, alcohol wipes, vitamin E lotion and other supplies necessary for the use of a TENS/NMES unit is permissible where included in the prescription and the amount supplied is consistent with the usage schedule outlined by the ordering provider in the DME order.

86.    According to CMS guidance, which is incorporated by the cost containment rules applicable to the claims at issue, resupply is appropriate only where replacement supplies are requested by a Patient. Even then, billing for resupply items associated with a TENS or NMES unit is appropriate only under

HCPCS A4595 regardless of the number or type of items provided. One unit of HCPCS A4595 is reportable on a monthly basis where a two (2)-lead device is dispensed and two units of HCPCS A4595 are reportable on a monthly basis for resupplies associated with a four (4) or more lead device.

87.     Defendants also billed CPT Code 99199, which is described as follows: "99199 Unlisted special service, procedure or report".

88.     CPT Code 99199 pertains to a Special Report which is, as provided in the CPT coding manual, "A service that is rarely provided, unusual, variable, or new may require a special report. Pertinent information should include an adequate definition or description of the nature, extent, and need for the procedure; and the time, effort, and equipment necessary to provide the service."

89.     As a DME supplier, Defendants are not capable of providing any services. EMSI is merely a supplier. Therefore, EMSI cannot perform a service or procedure that would qualify it for reporting anything under CPT Code 99199.

90.     Defendants billed Plaintiffs for CPT Code 99199 for services it did not perform in an attempt to obtain additional unentitled reimbursements.

91.     HCPCS describes HCPCS A9901 as follows: "DME delivery, set up, and/or dispensing service component of another HCPCS code."

92.     In general, TENS units, NMES devices, and necessary re-supplies are usually delivered directly to patients personally or through the mail. There is no setup involved. Any expenses associated with dispensing the device are included in the reimbursement fee for the device. Accordingly, Defendants' billing of

HCPCS A9901 for "DME delivery, Set-up" is an example of inappropriate and fraudulent fragmenting/unbundling and/or billing for services that were not rendered.

93.    HCPCS A9901 is reportable only for "unusual circumstances" where personal delivery was required outside the durable medical equipment, prosthetics, orthotics and supplier's (DMEPOS) supplier's usual area according to guidance from CMS.  See Medicare Claims Processing Manual, IOM Pub 100-4, Chapter 20, Section 60.

94.    As there was no evidence to support that delivery occurred at all, let alone that there were unusual circumstances that required personal delivery outside the DME supplier's usual area, Defendants' billing of HCPCS A9901 represents billing for services not rendered or unjustified billing. Moreover, there is no justification for reporting this code for delivery of TENS resupplies, which were ostensibly sent through the mail and were not personally delivered per the code reported. As a result, Defendants' billing of this code is another attempt by Defendant to obtain substantially more in reimbursement than it was lawfully entitled to.

95.    With respect to supply items, the cost of initial supplies necessary for a patient to use a TENS or NMES device are included in the reimbursement for the device. Separate billing for initial supplies is a form of unbundling resulting in duplicate payment for the supplies given that the reimbursement for the device includes payment for the initial supplies. A charge for HCPCS E0730

or E0745 contains all items needed for the first month of use by the injured person. If any additional items are needed after the first month, those are considered resupply items.

96.    When resupply items are appropriately provided following the delivery of a TENS or NMES unit, the correct code, regardless of the amount or type of supplies provided is HCPCS A4595. This code is described in HCPCS as "Electrical stimulator supplies, 2 lead, per month, (e.g., TENS, NMES)."

97.    Where resupplies are provided for a four (4)-lead devices, A4595 is reportable in two (2) units. It is not, however, appropriate to bill the supplies separately and under various other HCPCS codes.

98.    Defendants' Scheme to Defraud Plaintiffs revealed a pattern of systematic billing for unbundled TENS/NMES supply items:

> A4245   Alcohol wipes, per box
> A4362   Skin barrier; solid, 4 x 4 or equivalent; each
> A4556   Electrodes (e.g., apnea monitor), per pair
> A4557   Lead wires (e.g., apnea monitor), per pair
> A4630   Replacement batteries, transcutaneous electrical
>               stimulator, owned by patient
> A9900   Miscellaneous DME supply, accessory, and/or
>               service component of another HCPCS code
> E1399   Durable medical equipment, miscellaneous

99.    Review of the billing data reveals that Defendants knew how to code correctly but chose to not do so in most cases in a concerted effort to improperly obtain monies that they were not entitled to receive.  Claims review reveals that Defendants correctly reported TENS/NMES resupplies using the correct code

(HCPCS A4595) in select cases thereby demonstrating that Defendants were aware of the appropriate code for TENS resupplies but purposefully, fraudulently, and intentionally failed to code correctly for the vast majority of its claims, instead opting to improperly fragment or unbundle TENS supplies as a means of obtaining additional unentitled reimbursements.

100. Defendants separately reported HCPCS A4245 in as many as 32 units both initially and as an automatic monthly resupply indicating provision of as many as 32 boxes of alcohol wipes each month to a patient. Such wipes are usually packaged in boxes from 50 to 400 individually wrapped wipes. Yet, Defendants' bills do not identify the specific number of wipes per box provided and the physician's order for the TENS/NMES unit provides no detail as to the need for such wipes or the frequency of use. As a result, Plaintiffs independently determined that wipes were necessary.  Also, it is reasonably believed that Defendants were/are providing 32 wipes as opposed to 32 boxes of wipes. Assuming this to be the case, not only are Defendants substantially misrepresenting the amount of alcohol wipes provided, but they are inappropriately billing these TENS supplies separately, which constitutes impermissible unbundling that led to substantial over payment. To the extent that these supplies are necessary for the administration of home TENS therapy, they are included in the TENS resupply code (A4595). By billing separately, Defendants attempted to obtain separate unentitled additional reimbursements.

101.   Defendants also separately billed for HCPCS A4362. This code is for reporting solid skin barriers associated with the use of an ostomy pouch. Skin barriers are an interface between the patient's skin and the pouching system. They are used to create an adhesive seal between the skin and the pouch. Barriers can be curved with a built-in convexity creating a more adhesive bond to the patient's skin and better protrusion of the stoma. These codes represent solid ostomy skin barriers that are used independently, usually with a pouch that does not have its own integral skin barrier.

102.   As such, Defendants billed Plaintiffs for non-required ostomy supplies. Defendants' billing Plaintiffs for HCPCS A4362 completely misrepresents the supply provided. Defendants were not providing solid 4x4 skin barriers but were instead providing Vitamin E lotion. Vitamin E lotion is generally not included on the physician's order. Absent an order for this product, it is not compensable.   Here, EMSI made the determination to supply the Vitamin E lotion. Even aside from this issue, to the extent that these supplies are necessary for the administration of home TENS/NMES therapy, they are included in the resupply code (A4595). As a result, all charges associated with HCPCS A4362 represent a supply that was not provided (as coded) and/or a supply that was not ordered or justified. Again, Defendants unbundled this supply in an attempt to obtain separate unentitled additional reimbursements.

103.   In addition to the above codes, Defendants also always separately billed units of HCPCS A4556 for either the initial or resupply of TENS/NMES

electrodes even in cases where a conductive garment was dispensed eliminating the need for electrodes. The initial supply of electrodes is also included with the TENS/NMES device and is not separately billable[6].

104.   While HCPCS A4556 superficially represents "electrodes," this code is NOT for TENS/NMES electrodes given that TENS/NMES resupplies, including electrodes, are included in the general resupply code (HCPCS A4595). HCPCS A4556 is appropriately used for reporting of electrodes for NON-TENS/NMES devices such as apnea monitors and home EKG monitoring equipment.

105.   Defendants also charged Plaintiffs HCPCS A4557 in two (2) units for provision of initial or replacement TENS/NMES lead wires. The initial supply of lead wires is included with the device and is not separately chargeable, as is the case with electrodes.

106.   A lead wire is a durable (i.e., not a wear out) item. As a result, it is not a "supply" item.

107.   Physician's orders are necessary before a replacement set of lead wires are provided to a patient. Yet, replacement lead wires were always shipped (usually every other month) in two sets indicating both pairs of lead wires needed to be replaced. Where a conductive garment was dispensed, only one set of lead wires was necessary. Lead wires were shipped automatically and without

---

[6]   It is notable that the supply code associated with TENS/NMES is a "re-supply" code according to its description.  There is no code for the initial supplies because these supplies are included with the device and reimbursement for these initial supplies is included in the reimbursement for the TENS/NMES device.  Separate reporting of these initial supplies is

evidence that the original set was damaged. Replacement lead wires were provided without the required physician's orders. For these reasons, it is apparent that Defendants developed a pre-conceived scheme to defraud the Plaintiffs by automatically providing replacements for lead wires that were not damaged.  Even if the lead wires were considered a wear out TENS/NMES resupply item, not only would it be unlikely that lead wires would become damaged and need replacement on a predicable schedule, but they would be included in HCPCS A4595.  The attempt to charge separately constituted impermissible fragmenting/unbundling to obtain additional unentitled reimbursements.

108.   Furthermore, Defendants falsely and fraudulently billed Plaintiffs for HCPCS A4630. Defendants separately billed for an initial supply, as well as resupply, of rechargeable batteries to power TENS/NMES units using HCPCS A4630.   However, TENS/NMES units come with the required rechargeable batteries, which are not separately reportable, just like electrodes and lead wires. Despite that the batteries were re-chargeable, Defendants routinely provided them to Patients on a monthly basis and billed Plaintiffs accordingly. Even if they happened to be a necessary wear-out item, the batteries would be considered a resupply item and would thus be included in HCPCS A4595. Billing them separately constituted impermissible fragmenting/unbundling for purposes of obtaining additional fraudulent reimbursement.

---

an improper attempt to obtain duplicate payment and/or constitutes impermissible

109.   Defendants fraudulently charged Plaintiffs for replacement charging devices on a predicable schedule. These devices, which are not a consumable resupply item and are included with the TENS/NMES device, were billed separately.  Defendants used HCPCS E1399, an unlisted oxygen supply code, to bill for these items unlawfully. In addition to the fact that E1399 is an improper code for a charging unit, a charging unit is not a consumable supply and therefore where replacement was necessary, there would have to be documentation demonstrating that the original device failed, an order for its replacement by the treating physician, and evidence of delivery. None of this was documented by Defendants and as a result, Defendants' billings under E1399 for either the initial or replacement battery charger were improper, wrong, and fraudulent. Supposing that a battery charger is a consumable TENS/NMES resupply item, which it is not, a battery charger would be properly included within HCPCS A4595. In that case, Defendants' separate billing of HCPCS E1399 to Plaintiffs represented impermissible fragmenting/unbundling and yet another fraudulent attempt to obtain additional unentitled reimbursements.

110. All of the aforementioned "supplies," when provided as TENS/NMES resupply items, should have been reported collectively using HCPCS A4595 as described above, only when the re-supply items were requested by Patients, and where there was evidence that the items were actually delivered. The documentation provided does not confirm requests or deliveries of these

---

fragmenting/unbundling.

supplies. Nonetheless, to the extent that the items were in fact supplied at all, Defendants' separate billing of each supply using the codes detailed above, which misrepresent what was provided, rather than reporting HCPCS Code A4595, demonstrates Defendants' knowing[7] attempts to obtain significant additional unentitled reimbursements.

111.   Florida, Pennsylvania, and Oklahoma, incorporate Centers for Medicare and Medicaid Services ("CMS") fees and (to some degree) reimbursement guidance.  Because Defendants did not bill in accordance with that guidance in nearly all cases (but did so for a small number of cases), it is clear that Defendants knew how to bill properly but, instead, chose to intentionally and systematically unbundle initial supplies, miscoded resupplies, and automatically resupplied unnecessary items to unlawfully and fraudulently obtain unentitled reimbursement.

112.   Even assuming CMS reimbursement rules and/or its fee schedule were inapplicable, miscoding of TENS/NMES units, unbundling of initial supplies and/or mis-coding/un-bunding of resupplies is wholly improper based on the plain descriptions of the codes reported versus the correct codes. Correct coding is required for all claims and in all states, no matter what type of claim, case, or injury is at issue.

## IV.   Defendants Fraudulently Used Billing Codes To Induce Unentitled Payment

---

[7]   Based on the fact that EMSI billed TENS/NMES resupplies properly for some of its claims.

113.   Defendants falsely, purposefully, and intentionally misrepresented the TENS/NMES devices it allegedly provided using E1399 and in the process, obtained substantially more reimbursements than it was entitled to because use of E1399 allowed it to bypass the applicable fee schedule.

114.   By way of example, in select cases, Defendants billed its TENS/NMES device correctly using HCPCS E0730.   In most cases, it reported the same device using HCPCS E1399.   The charge amount for HCPCS E0730 was approximately 50% (or less) of that which it charged using E1399.

115.   Defendants routinely unpacked the initial supplies that came with the device and inappropriately reported those supplies separately resulting in duplicate reimbursement for those supplies.

116.   With respect to resupplies, Defendants correctly used HCPCS A4595 when billing TENS/NMES resupplies in a small number of cases. This clearly demonstrates that Defendants knew how to properly code resupplies.   In other cases, however, Defendants used improper HCPCS codes to represent each individual resupply item and therefore knowingly, intentionally, and fraudulently miscoded and unbundled those supplies. The miscoding/unbundling of TENS/NMES resupply items resulted in substantial additional unentitled reimbursement.

117.   Defendants reported codes for services that it did not and could not provide – again, in an improper attempt to fraudulently induce Plaintiffs to pay for those services and increase its reimbursements.

118.   In every instance where Defendants misrepresented what was provided, Defendants received additional and unentitled reimbursement. Defendants never once billed in a manner that resulted in a lower reimbursement than they were otherwise entitled to receive.

119.   Defendants engaged in and implemented a well-planned, wide-spread, systematic scheme to inflate its bills and inflate reimbursements.

120.   Defendants' actions, as stated above, constitute fraud.

121.   Defendants should not be entitled to any compensation. Defendants not only purposefully miscoded the TENS/NMES units and supplies provided, but also failed to follow standard documentation requirements.  In not one instance did the Defendants obtain or maintain proof that it actually provided any of the TENS/NMES devices or supplies that it billed for.

122.   Defendants' widespread fraud against Plaintiffs is evident when analyzing the entire universe of claims filed in Florida, Oklahoma and Pennsylvania from April 2014 through March 2021 wherein Defendants obtained a total of $1,319,817.57 in unentitled payments.

123.   During the relevant time, the allowable reimbursement rate for a TENS/NMES unit billed under HCPCS E0730/E0745 (as appropriate) was significantly lower than the amount that could be received for E1399.  Defendants intentionally, knowingly, and fraudulently utilized HCPCS E1399 to bypass the applicable fee schedule to obtain a much higher reimbursement than allowed under the proper, applicable codes.

124.   As part of Defendants' Scheme to Defraud Plaintiffs, Defendants utilized HCPCS E1399 for the FLEX-IT, FLEX-TENS and IF-5000 Combo devices units. If Defendants had billed the unit as a TENS unit under E0730, Defendants would not have received compensation anything close to what they ultimately received by intentionally utilizing HCPCS E1399 for TENS units it billed to Plaintiffs.

125.   As part of Defendants' Scheme to Defraud Plaintiffs, Defendants utilized HCPCS E1399 for the Flex-MT units. If Defendants had billed the unit as a NMES unit under E0745, Defendants would not have received compensation anything close to what they ultimately received by intentionally utilizing HCPCS E1399 for NMES units it billed to Plaintiffs.

126.   HCPCS E1399, is an unlisted code. It is only to be used when there is no applicable other code for the DME item being supplied. Additionally, strictly speaking, the E1399 unlisted code should only be used to represent an otherwise undefined (by a specific HCPCS code) oxygen supply item.  Defendants did not provide an oxygen related device.

127.   Moreover, an applicable HCPCS code existed for the DME items and supplies that Defendants charged and billed Plaintiffs for. This remains true regardless of whether the DMEs were prescribed to be used as a TENS unit (E0730) or as a NMES unit (E0745).

128.   It was also part of the Defendants' Scheme to Defraud Plaintiffs for Defendants to miscode the DME items and supplies it allegedly provided in

order to increase its reimbursements from Plaintiffs by submitting these deliberately false billing forms to Plaintiffs. Defendants, EMSI and Mr. Garcia, employed this scheme knowingly, intentionally, and fraudulently to grossly and excessively overcharge Plaintiffs.

129. Defendants knew how to properly code but failed to do so. Defendants did properly report the TENS/NMES units using the proper HCPCS Codes (e.g., E0730 or E0745) in limited cases. Yet in the vast majority of cases, Defendants reported the same TENS/NMES unit using the improper E1399 code. With respect to TENS/NMES resupplies, Defendants in some cases reported the appropriate resupply code (A4595) while in the vast majority of other cases, Defendants miscoded and unbundled each resupply item provided. In every case, the misrepresentation of what was provided was designed to obtain substantial additional unlawful reimbursements.

130. Defendants knowingly, intentionally, and fraudulently separately billed for the TENS/NMES device, and then unbundled and separately billed for each of the supplies that is included with the TENS/NMES device. These unbundled supplies included the electrodes, lead wires, rechargeable batteries, battery recharger, as alleged above.

131. When DME is initially provided to a patient, all supplies are to be included, and the HCPCS codes and rates take this into account and do not permit unbundling.

132. As a result of unbundling and then separately billing supplies to

accompany the initial DME order, Defendants knowingly, intentionally, and fraudulently substantially over billed Plaintiffs.

133.    It was also part of Defendants' Scheme to Defraud Plaintiffs for Defendants to misrepresent the resupply items provided therefore resulting in the unbundling of those resupplies and extensive overbilling the Plaintiffs.

134.    Defendants' Scheme to Defraud Plaintiffs is also evidenced by Defendants' routine and automatic replacement of non-wear-out items such as lead wires, rechargeable batteries, and battery chargers that were initially provided by Defendants. These durable items were predicably replaced without any evidence that the original items supplied were defective and without any medical documentation indicating a physical order for these DME items. Defendants knowingly, intentionally, and fraudulently sent and billed for these items with the intent to induce and obtain additional unwarranted payments from Plaintiffs.

135.    Defendants also knowingly, intentionally, and fraudulently, routinely renewed supplies on a monthly basis without request for resupply by the patients.

136.    Defendants' above-described fraudulent acts were done intentionally and knowingly for the financial gain of both Defendants through generation of billing that was designed to induce unwarranted payments from Plaintiffs.

137.    Defendants were required to comply with coding rules and bill for

items pursuant to those codes when submitting bills for medical equipment to Plaintiffs. Further, Defendants were precluded from falsely or improperly inducing Plaintiffs to pay for items or services that were not provided or were other than what was represented on the claim.

138.   Plaintiffs were induced by Defendants to pay, and did pay, $1,588,443.31 in total.

139.   Plaintiffs made payments to Defendants by way of reasonable reliance and in belief of the accuracy of the aforementioned billing codes assigned and submitted by Defendants. As such, Plaintiffs seek to recover all of these payments and expended sums as compensatory damages.

140.   Defendants sent the false, misleading, and inaccurate bills with the intent to obtain unentitled payments from Plaintiffs.

141.   Defendants knew the medical bills and codes were false and deceptive and that Plaintiffs relied on the bills when making payment decisions.

142.   In fact, when questioned about the propriety of the codes submitted, Defendants would send correspondence to Plaintiffs supporting their miscoding, knowing the codes were wrong, and for purposes of inducing Plaintiffs to pay the excessive amounts Defendants charged for the improperly coded items and supplies. E.g., Exhibits 24, 25, and 26.  This demonstrates Defendants' intent to knowingly, purposefully, and intentionally mislead Plaintiffs in a calculated effort for the Defendants to obtain monies they were

not entitled to receive.

143.   Defendants knew and relied on the fact that Plaintiffs were relying on the purported truth and accuracy of Defendants' bills and documentation to determine the amounts payable.

144.   Defendants' Scheme to Defraud Plaintiffs and their fraudulent billing scheme was orchestrated and utilized by Defendants to obtain payments for which they knew they were not entitled and solely for Defendants' own financial benefit.

145.   This fraudulent billing scheme, which was orchestrated and utilized by Defendants to obtain payments, for which they knew they were not entitled and solely for Defendants' own financial benefit, was intended to, and did, cause continued harm and detriment to Plaintiffs.

146.   Defendants' actions giving rise to this lawsuit reflect that Defendants acted with malice, intent, and knowledge, sufficient to entitle Plaintiffs to recover compensatory, as well as punitive damages and/or treble damages, as permitted under the statutes and counts, *infra*.

147.   In further promotion of Defendants' Scheme to Defraud Plaintiffs, Defendants fraudulently concealed the scheme described in this Complaint. In connection with the activities of Defendants giving rise to this action, Defendants intentionally acted to fraudulently conceal the true nature of the DME items and supplies provided in order to insulate themselves from liability

for their fraudulent activities, including, but not limited to, preparing bills, and invoices, in such a manner that a reasonable insurance company would believe that the DME items and supplies charged for were provided consistent with the CPT and HCPCS codes reported.

148.   Plaintiffs were unaware of Defendants' Scheme to Defraud Plaintiffs. Instead, Plaintiffs reasonably relied upon the purportedly valid medical/billing codes submitted by Defendants and thus were fraudulently led to believe Defendants' fraudulently submitted invoices were valid even though they sought payment for inflated, unbundled, and/or duplicate charges.

149.   Due to Defendants' concerted effort to conceal their fraudulent activities, Plaintiffs did not discover their injury and the source of their injury, despite the exercise of reasonable diligence, until September 27, 2021.

150.   At all times, Plaintiffs exercised reasonable diligence, including, but not limited to, employing claim investigators to review and evaluate claims, as well as review medical bills submitted by Defendants. While the claims individually appear superficially appropriate, subsequent data analysis regarding the entirety of Defendants billing and coding revealed potential inaccuracies which caused Plaintiffs to retain an expert.  Said expert reviewed Defendants' medical bills and documentation and provided an opinion on the codes submitted by Defendants.

## V.   **DEFENDANTS' FRAUD PERMEATES THROUGHOUT ALL DATA**

151.    Exhibits 8-17 provide specific instances and examples of Defendants' intentionally false and misleading invoices and bills, which Defendants submitted to Plaintiffs in furtherance of Defendants' scheme to defraud Plaintiffs. The billing records and related claims and data (with names, personal information, and privileged information redacted) for Patients are attached, respectively, as Exhibits 8-17.

152.    Exhibits 8-17 contain the "who," "what," and "when" regarding Defendants' Scheme to Defraud Plaintiffs.

153.    As to the issue of "where" this fraud took place, at all times, the bills were issued from Florida by Defendants, and monies sent to Defendants in Florida. Defendants' fraud started and ended in Florida, and Defendants utilized their Florida address for receipt of each check payment.

154.    Since Defendants are located in Florida, Defendants' actions were done by and on behalf of EMSI, a Florida corporation with Florida residence, with Defendants' knowledge and consent.  Its actions directly impact Florida.

155.    Plaintiffs' allegations pertain only to Defendants' fraudulent actions as alleged herein. Plaintiffs are not making any allegation as to necessity, causation, or other matter which would be under the specific auspice of any other Court (e.g., a worker's compensation commission). Plaintiffs, however, allege Defendants engaged in the alleged fraudulent actions that arise in whole or in part in Florida.

156.    Plaintiffs chose claims from three (3) states (Florida, Pennsylvania, and Oklahoma) to bring Defendants' fraud on Plaintiffs before this Court. Defendants' intent to defraud Plaintiffs is clearly illustrated by these claims. These states were chosen because their Worker's Compensation and personal injury cost containment laws follow, and adhere to, Medicare CMS code selection and reimbursement rules.  As such, Defendants were required to code and document pursuant to CMS requirements. If Defendants failed to do so, then Defendants' failure to bill and document as alleged above renders all bills non-compensable. Review of these claims clearly shows that Defendants acted fraudulently and caused Plaintiffs great financial harm.

157.    In fact, Plaintiffs went even further and attempted to look at all bills in the three (3) states (Florida, Pennsylvania, and Oklahoma) where Defendants directly billed the Plaintiffs to further bring Defendants' fraud on Plaintiffs before this Court.  None of these states permit Defendants to charge, code, or bill improperly or fraudulently, which Defendants have done in each of these representative three (3) states.  Defendants billed and received payment for all claims for all states in Florida and/or had a direct benefit to its business which is incorporated in Florida.  Defendants' failure to bill and document correctly, as alleged above, renders all bills non-compensable. Review of these claims clearly shows that Defendants fraudulently acted causing Plaintiffs great harm.

158.    Defendants' fraud and failure to bill and document as required by CMS renders that all bills to Plaintiffs not be reimbursable and Plaintiffs are

entitled to recover all monies unlawfully paid.

159.    Additionally, and alternatively, fraudulent claim submission is not permitted in any state, including Florida.

160.    All billing entities in all states, and for all services, are required to be truthful, accurate, and utilize the proper and correct CPT and HCPCS Codes. Had Defendants billed and documented appropriately, they would have been entitled to $1,319,817.57.

161.    The master spreadsheet contains all information from the billing records submitted by Defendants to Plaintiffs. Each and every item billed on the master spreadsheet constitutes a separate and distinct fraudulent act by Defendants. All of this fraudulent billing was done in furtherance of Defendants' Scheme to Defraud Plaintiffs, as outlined above, in Exhibits 8-17, and also as reflected below for each of the exemplar Patients.

162.    As examples/exemplars for the fraudulent activity undertaken by the Defendants, Plaintiffs attach spreadsheets as examples of Defendants' fraudulent charges for each jurisdiction in Exhibits 18-23.   Plaintiffs have provided a line-by-line analysis of the claimed activity as well as the reasoning why the coding was improper and fraudulent.

        a.  Florida workers compensation examples are attached as Exhibit 18.

        b.  Florida personal injury examples are attached as Exhibit 19.

    c.   Pennsylvania workers compensation examples are attached as Exhibit 20.

    d.   Pennsylvania personal injury examples are attached as Exhibit 21.

    e.   Oklahoma workers compensation examples are attached as Exhibit 22.

    f.   Oklahoma personal injury examples are attached as Exhibit 23.

163.    In each instance involving an exemplar Patient in Exhibits 18-23, the invoices and bills submitted by Defendants to Plaintiffs for Patients were knowingly false and misleading. The bills, and invoices from Defendants for these Patients were knowingly, intentionally, and fraudulently miscoded so Defendants could intentionally and fraudulently obtain substantial additional unentitled reimbursement from Plaintiffs. Additionally, Defendants knowingly, intentionally, and fraudulently billed Plaintiffs for items or supplies without documentation of delivery indicating that the items or supplies were actually provided as indicated on the claims submitted for payment.

164.    Furthermore, resupply items to Patients were knowingly, intentionally, and fraudulently billed by Defendants to Plaintiffs in the same misleading and fraudulent manner.

165.    The same fraudulent practices committed by Defendants with

respect to Exhibits 18- 23, were done, not just for these Patients, but also for the Patients identified on the spreadsheets attached as Exhibits 8-17.

166.    The bills submitted by Defendants described herein contain misrepresentations intended to obtain improper payments from Plaintiffs in violation of Federal and state law as enumerated below.

167.    Plaintiffs attempted to resolve this matter with the Defendants who denied any wrongdoing and disputed Plaintiffs' concerns. Plaintiffs investigated all Defendants' claims as to the appropriateness of their billing and found their claims to be false and devoid of merit. Once Plaintiffs' investigation was completed, Plaintiffs believed they had a good faith basis to bring the instant lawsuit. Defendants, however, continue to bill in the same fraudulent manner alleged herein to the present date.

## VI.    ACTS OF MAIL AND WIRE FRAUD

168.    Every insurance claim detailed herein involved at least two uses of the United States Mail and/or two uses of interstate telephones and/or electronic mail.  These mail and telephone/wire communications included, by way of illustration rather than limitation, notice of claims, invoices, bills, correspondence, insurance payments, insurance contracts, statements, claims settlement checks, as well as return of settlement draft duplicates to the insurance carrier's out of state home office for filing.  The dates for the services allegedly rendered are attached on Exhibits 8-17.

169.    Each claim involves at least two mailings since negotiated checks

are transported via the U.S. Mail.

170.   The telephone communication involving the claims at issue in this action occurred between Defendants and Plaintiffs' offices, which also occurred across interstate lines.   Consequently, the majority of the telephonic communications constituted interstate activity. In total, Plaintiffs estimate that Defendants' fraudulent claims generated hundreds of mailings and interstate telephone communications.

171.   Upon information and belief, each Defendant used the mail and interstate telephones and wires to further the fraudulent scheme and/or acted with knowledge that the use of the mail, emails, and interstate telephones would follow in the ordinary course of business.

172.   Upon information and belief, Defendants knew or should have known that an insured, claimant, medical facility and/or representative of Plaintiffs would use the mail and interstate telephones to facilitate payments to the recipients.

## VII.   Damages Suffered By Plaintiffs Due To Defendants' Scheme To Defraud Plaintiffs

173.   Plaintiffs were injured in their business by Defendants' misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by Defendants as set forth herein. Such injuries include: the loss of monies paid pursuant to and as a result of the false, fraudulent, and inflated medical bills.

174.   As alleged above, in order to secure payments from Plaintiffs, Defendants issued bills and invoices including certain CPT and HCPCS codes to document the nature of service. Plaintiffs reasonably relied upon the representations set forth in Defendants' billing records to make payments to Defendants.

175.   In turn, Defendants collected and retained the proceeds paid by Plaintiffs for items purportedly provided by Defendants and billed for by Defendants, their agents and/or its employees.

176.   From at least the year 2014 to the present, Defendants issued or caused to be issued invoices that were fraudulent and improper.

177.   From at least the year 2014 to the present, Plaintiffs paid over $1,588,443.31 to Defendants and Plaintiffs seek to recover all payments as compensatory damages in this case.

178.   Plaintiffs also seek as damages monies paid and costs incurred for claims in an amount to be determined, along with damages described throughout this Complaint and available pursuant to the causes of action described herein.

179.   Plaintiffs also seek to recover their investigative costs, as well as costs of suit and attorneys' fees, as well as treble damages, since Defendants have engaged in a pattern of statutory insurance fraud, were advised of the same, and continue to engage in the same Scheme to Defraud Plaintiffs.

180.   Plaintiffs' damages continue to accrue through the course of this

litigation.

181.   The relief sought by Plaintiffs against Defendants includes compensatory damages, payments made by Plaintiffs to Defendants and individuals allegedly treated by Defendants, punitive damages, treble damages, costs of suit, interests, attorneys' fees, and all other relief that this Court finds just and equitable and warranted by applicable law.

## VIII.  CAUSES OF ACTION

### A.      FEDERAL CAUSES OF ACTION

### COUNT I
### (Against EMSI)
### Declaratory Judgment (22 U.S.C. §§ 2201, *et. seq.*)

182.   Plaintiffs re-allege and incorporate by reference all paragraphs set forth above as if fully set forth herein.

183.   A real, actual, and justiciable controversy exists between the parties. This Court has the jurisdiction to declare the rights and obligations of the parties pursuant to 28 U.S.C. § 2201.

184.   Defendants wrongfully and fraudulently submitted bills for TENS/DME units and related supplies and resupplies in excess of $75,000.00.

185.   The activities of the Defendants were fraudulent and, therefore, not compensable.

186.   Plaintiffs have no obligation to pay pending and/or previously denied claims submitted by or on behalf of the Defendants to the Plaintiffs as alleged and described herein.

187.   As a result of Defendants' fraud any and all billings and/or invoices are null, void, and uncollectible.

188.   Further, Plaintiffs are entitled to recover any and all payments issued to Defendants.

189.   Accordingly, Plaintiffs request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to Plaintiffs.

WHEREFORE, Plaintiffs seek judgment declaring that all outstanding claims and charges that Defendants submitted, or caused to be submitted, to Plaintiffs for payment to date and through the trial of this case are not owed. Further, declaring that Plaintiffs are entitled to recover all prior payments issued to Defendants in connection with Defendants' Scheme to Defraud Plaintiffs.

## COUNT II
### (Against All Defendants)
### RESTITUTION

190.   Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 189 of this Complaint.

191.   Plaintiffs paid amounts in excess of the appropriate amounts permitted for the items allegedly supplied by the Defendants. Plaintiffs made payments to Defendants by way of reasonable reliance and in belief of the accuracy of the records created and submitted by Defendants. As such, Plaintiffs seek to recover all of these payments and expended sums as compensatory

damages.

192.   Defendants knowingly and intentionally sent false, misleading, and inaccurate bills to Plaintiffs. Defendants also sent the false, misleading, and inaccurate bills to others (e.g., various individuals, including personal injury attorneys, defense attorneys and Plaintiffs) to obtain payments.

193.   If pre-authorization was required, Defendants would submit the codes and charges asserting that they were reasonable, appropriate, and/or correct when in fact, they were not in a concerted effort to obtain and receive monies they were not entitled to receive.   If the codes were challenged, Defendants would send documentation asserting the codes were appropriate, when in fact they were not.

194.   Defendants intended that Plaintiffs would be induced by such false and fraudulent representations to provide payments to Defendants for durable medical equipment, supplies, and resupplies allegedly provided to Patients making claims submitted to Plaintiffs.

195.   Plaintiffs and their adjusters, agents, employees, and others justifiably relied on these representations made by the Defendants in making payments to Defendants in belief that the medical billing, as reflected in their documentation, was accurate, reimbursable.

196.   As a result of Defendants' false and fraudulent representations Plaintiffs suffered injury in Florida and several other states as set forth above and described throughout this Complaint. Plaintiffs have been harmed by

Defendants' billing misrepresentations and injured by payments they made for services that Defendants were not otherwise entitled to.

197. The representations/misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants as set forth above, including that which is described throughout paragraphs 1 through 189 and the referenced exhibits, constitute knowingly false and fraudulent representations.

198. Plaintiffs justifiably relied on these representations/misrepresentations made by the Defendants as described in this Complaint, including but not limited to the representations described throughout paragraphs 1 through 189 in making payment to Defendants and others in the belief that treatment, services, and DME units, supplies, and equipment, and resupplies, as reflected in the documentation was accurate and reimbursable under applicable law, and provided in accordance with applicable law and the records reflected true medical conditions, complaints and injuries.

199. As a result of the knowingly false and fraudulent representations/misrepresentations by Defendants, Plaintiffs suffered injury as set forth above in paragraphs 1 through 189 and as described throughout this Complaint.

200. The false and fraudulent representations/misrepresentations by Defendants were made with malicious intent, vindictiveness, and wanton disregard for the rights of Plaintiffs, and with the intent to harm Plaintiffs.

201.  When Plaintiffs paid monies on medical payments, uninsured motorist, underinsured motorist, and bodily injury claims based on documentation provided by Defendants, it did so under a mistaken factual belief.

202.  This belief was mistaken because the records submitted to Plaintiffs were false, misleading, and fraudulent and were not reimbursable under applicable law and were not provided pursuant to applicable law.

203.  If Plaintiffs had known the facts set forth in the preceding paragraphs, they would not have paid Defendants.

204.  Plaintiffs are entitled to recover from Defendants, each of whom have been unjustly enriched, in an amount equal to the portions of the payments Plaintiffs made.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, consequential damages, attorneys' fees, litigation expenses and any and all other additional relief this Court finds just and equitable and warranted by applicable law.

## COUNT III
## (Against All Defendants)
## FEDERAL RICO ACT 18 U.S.C. § 1962 (c)

205.  Plaintiffs re-allege and incorporate by reference all paragraphs set forth above as if fully set forth herein.

206.   At all times material, Plaintiffs were "persons" within the meaning and definition of 18 U.S.C. §§ 1961(3), 1962(c).

207.   Plaintiffs have standing to bring an action under RICO because a direct relationship exists between the damages set forth herein and Defendants' conduct. Plaintiffs were the intended target of Defendants' injurious conduct which is described herein.

208.   At all times material, Defendants were "persons" within the meaning and definition of 18 U.S.C. §§ 1961(3), and 1962(c).

209.   Defendants formed an ongoing association for purposes of defrauding Plaintiffs. Defendants operate as an ongoing organization. Defendants are responsible for the operation and management of EMSI. Defendants are an enterprise within the meaning of 18 U.S.C. § 1961(4) because these entities are associated-in-fact and have colluded to submit illegal and unlawful charges to insurance carriers, including Plaintiffs, throughout the United States.

210.   Plaintiffs are the victim of said enterprise.

211.   At all times relevant, the aforementioned enterprise was engaged in interstate commerce, or in activities which affect interstate commerce pursuant to 18 U.S.C §§ 1961(4) and 1962(c) by the submission of insurance claims outside the State of Florida.

212.   Defendants engaged in racketeering activity by submitting the charges set forth in Exhibits 8-17 for services when Defendants knew and should have known that Defendants were operating illegally through their knowing

submissions of illegal and unlawful charges to Plaintiffs for payment. Defendants intended to defraud Plaintiffs as evidenced through their knowing submissions of illegal and unlawful charges to Plaintiffs for payment.

213.   Mail fraud is a predicate offense under the RICO statute which prohibits "devising ... any scheme ... for obtaining money or property by means of false or fraudulent pretenses, representations ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ....." 18 U.S.C. § 1341.

214.   Defendants' conduct constitutes mail fraud because billing representatives from Defendants' businesses submitted HCFA-1500 forms and/or billing invoices via U.S. Postal Service to Plaintiffs for the purpose of obtaining money under the false pretense that the billings submitted were lawful.

215.   These communications involved interstate commerce because Plaintiffs' principal places of business are as stated in Paragraph 33 and Plaintiffs operate claims offices throughout the country. Defendants' principal place of business is Florida.

216.   As part of and in connection with each of the claims identified in Plaintiffs' Complaint (including attached exhibits), Defendants intentionally caused the preparation and mailing of healthcare documentation in connection with claims in furtherance of their Scheme to Defraud Plaintiffs.

217.   Defendants employed one or more mailings to demand and/or receive payment from Plaintiffs which include, but are not limited to, those dates identified in Plaintiffs' attached exhibits.

218.   The CMS 1500 forms (also known as HCFA 1500 forms), documents and claim settlement demand letters were routinely delivered to Plaintiffs by or at the direction of Defendant Garcia.

219.   Payments from Plaintiffs directly to Defendants were made via the United States mail.

220.   Payments made by Plaintiffs to Defendants and personal injury attorneys who represented Patients were also made via the United States mail.

221.   Wire fraud is a predicate offense under the RICO statute, which prohibits "devis[ing] any scheme or artifice ... for obtaining money ... by means of false or fraudulent pretenses, representations ... or causes to be transmitted by means of wire ... communication in interstate ... commerce ... any writings ... for the purpose of executing such scheme...." 18 U.S.C. § 1343.

222.   Defendants' conduct constitutes wire fraud because billing representatives from Defendants' businesses submitted HCFA-1500 forms and/or billing invoices via wire to Plaintiffs for the purpose of obtaining money under the false pretense that the treatment allegedly provided and the billings submitted were lawful.

223.   These communications involved interstate commerce because Plaintiffs' principal places of business are outside of Florida and Plaintiffs operate

claims offices throughout the country. Defendants' principal place of business is located in Florida.

224.   Defendants' submission of false and unlawful charges to Plaintiffs shows that Plaintiffs were the intended target of Defendants' unlawful conduct. The damages to Plaintiffs were foreseeable, concrete, and not subject to speculation.

225.   The illegal and unlawful submissions have been submitted to Plaintiffs for a period in excess of one year and constitute a pattern of racketeering activity.

226.   Defendants repeatedly and intentionally submitted or caused the submission of billing documentation to Plaintiffs for the aforementioned items in order to collect payment from Plaintiffs.

227.   As a direct result of, and in reasonable reliance upon, these false and misleading documents and misrepresentations, Plaintiffs, by their agents and employees, issued payments to the benefit of Defendants that would not otherwise have been paid.

228.   Defendants' pattern of fraudulent claims appeared legitimate on its face for each claim and the actions undertaken by the Defendants, as alleged herein, prevented Plaintiffs from discovering the fraudulent scheme, which enabled Defendants to continue their scheme without being detected.

229.   The acts of Defendants set forth above constitute violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C § 1343 (wire fraud).

230.   By filing numerous false and fraudulent claims for benefits in their ongoing scheme, Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962 (c).

231.   Defendants' participation in the operation of the scheme to defraud Plaintiffs had the direct effect of causing funds to be transferred from Plaintiffs to the benefit of Defendants.

232.   Plaintiffs are in the business of insurance in the State of Florida as well as other states. The insurance fraud schemes that were practiced in Florida by Defendants have had a negative effect on Plaintiffs' overall financial well-being – as seen by the amounts stated in the Exhibits - and, upon information and belief, have negatively affected insurance rates.

233.   At all times relevant herein, Plaintiffs reasonably relied upon representations of past and/or present material facts made by Defendants to Plaintiffs' detriment.

234.   Defendants participated both directly and indirectly in EMSI's conduct through a pattern of racketeering activities.

235.   Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiffs' injuries.

236.   Plaintiffs have been damaged in an amount in excess of Seventy Five Thousand Dollars ($75,000.00), which is set forth with particularity in Exhibits 8-17.

237.   Based upon Defendants violations of 18 U.S.C. 1962(c), Plaintiffs are entitled to recover from these Defendants treble damages pursuant to 18 U.S.C. § 1964(c), together with the costs of this suit, which include reasonable attorneys' fees.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, consequential damages, punitive damages, treble damages, attorneys' fees, litigation expenses and any and all other additional relief this Court finds just and equitable and warranted by applicable law.

## COUNT IV
### (Against All Defendants)
### RICO CONSPIRACY VIOLATION 18 U.S.C § 1962 (d)

238.   Plaintiffs re-allege and incorporate by reference all paragraphs 1 – 237 as if more fully set forth herein.

239.   Defendants and individual agents of Defendants conspired with each other to violate 18 U.S.C § 1962 (c) through the operation of EMSI.

240. Defendants and individual agents of Defendants agreed to participate in a conspiracy to violate 18 U.S.C § 1962 (d) by agreeing to conduct the affairs of Defendant EMSI by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth and through the preparation and/or submission of false and fraudulent insurance bills and documents to Plaintiffs.

241.   Defendants conspired to conduct or participate in the conduct of the enterprise through a pattern of racketeering activity, as described in Count III.

242.   The purposes of the conspiracy were to use Defendants' business as a means to obtain monies that they were not entitled to receive, artificially inflate the value of claims to obtain larger than warranted payments from Plaintiffs upon settlement of Patients' first and third party claims and obtain payments from Plaintiffs related to services that the Defendants knew were not compensable through their fraudulent and improper use of the codes and unbundling of the same.

243.   Defendants were aware of these purposes and agreed to take the steps necessary to meet the conspiracy's objectives, which included the creation, preparation and/or submission of false and misleading patient bills to obtain payments from Plaintiffs. All information stated in Exhibits 8-17 contained misrepresentations of material fact, omissions of material fact, and/or false representations made by one or more of the Defendants.

244.   Plaintiffs have sustained injury to both their business and property by reason of the Defendants' conspiracy and their conduct in support of that conspiracy prompting Plaintiffs to make claim payments as a result of Defendants' unlawful conduct, which has been set forth in this Complaint.

245.   Based upon the Defendants' violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiffs for their damages. Plaintiffs are entitled to recover from each Defendant identified three times the

damages sustained by reason of the claims submitted by Defendants and others acting in concert with them, together with the costs of this suit and reasonable attorneys' fees.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, consequential damages, compensatory damages, consequential damages, treble damages, punitive damages, attorneys' fees, litigation expenses and any and all other additional relief this Court finds just and equitable and warranted by applicable law.

**B.    FLORIDA CAUSES OF ACTION**

**COUNT V**
**(Against All Defendants)**
**FLORIDA RICO VIOLATION OF Fla. Stat. Ann. §772.103**

246.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 245 of this Complaint as though more fully contained herein.

247.    EMSI and Mr. Garcia, acting jointly and severally, engaged in conduct as alleged above, which constitutes racketeering activity as defined in Fla. Stat. § 895.02(1) (Fla. fraud), violations of Fla.  Stat. § 817.034 (Fla. ins. fraud), as well as 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud) in furtherance of Defendants' Scheme to Defraud Plaintiffs.

248.    The defendants committed two or more predicate acts within ten-year time span, the predicate acts were related to one another, and predicate acts

demonstrated criminal conduct of continuing nature.

249.   Defendants, working in concert, made false and fraudulent representations in support of Defendants' Scheme to Defraud Plaintiffs with the intent to obtain, and in fact, did obtain insurance proceeds that Defendants had no legal right to receive.   More specifically, Defendants misrepresented that Defendants' DME was lawfully provided and billed. Defendants false and misleading statements of material fact and acts of fraudulent concealment include but are not limited to: (i) Defendants' fraudulent and intentional use of improper coding for DME units, supplies and equipment, and resupplies; (ii) Defendants' fraudulent and intentional unbundling of TENS/NMES units and initial supplies when the appropriate billing codes would have accounted for the TENS/NMES units and initial supplies together since they are packaged as one unit if appropriately billed; (iii) Defendants' fraudulently, automatically, and systematically provided and invoiced and unbundled resupplies to patients and billed Plaintiffs for the same; (iv) Defendants knowingly and intentionally sent the false, misleading, and inaccurate bills to Plaintiffs and others. Defendants sent the false, misleading, and inaccurate medical bills for payment. The acts of these Defendants demonstrate that, collectively, they formed an association-in-fact enterprise, separate and distinct from any one individual Defendant named herein and which, in connection with each individual Defendant, conducted and participated in the affairs of this association-in-fact enterprise through this pattern of racketeering activity.

250.    Defendants continue and/or attempt to engage in the pattern of racketeering activity and in doing so are continuing to receive funds from Plaintiffs and to use those funds to commit further acts in furtherance of the conspiracy described above.

251.    The alleged acts appear to be the Defendants' regular way of conducting business.  Said activity by the Defendants is unlawful and/or that Defendants have treated other individuals or entities in the same manner alleged herein.

252.    By virtue of Defendants' violations of Fla. Stat. §895 et seq. each Plaintiff is an "aggrieved party" under Fla. Stat. §895.05(6) and is entitled to injunctive relief.

253.    Defendants having unlawfully received proceeds from Plaintiffs, have created an immediate danger of a significant loss of Plaintiffs' property and money.

254.    Defendants by continuing to engage in the racketeering activity alleged herein, including the predicate acts, which presents an immediate danger of continuing to defraud insurance companies, including the Plaintiffs, and to harm the public by engaging in fraudulent billing practices.

255.    Plaintiffs have no other adequate remedy at law at this time to prevent Defendants from disposing, transferring, and/or dissipating Plaintiffs' money or from continuing to use the funds to continue the enterprise described herein.

256.   Plaintiffs have a reasonable and substantial likelihood of success on the merits.

257.   Public policy considerations weigh in favor of the Court's granting injunctive relief requested herein.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, consequential damages, treble damages, punitive damages, attorneys' fees, litigation expenses and any and all other additional relief, including injunctive relief, this Court finds just and equitable and warranted by applicable law.

<u>**COUNT VI**</u>
**(Against All Defendants)**
<u>**VIOLATION OF FLA. STAT. §501.201 et. sec.**</u>
<u>**FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**</u>

258.   Plaintiffs incorporate, as fully set forth herein, each and every allegation in paragraphs 1 through 257 above of this Complaint.

259.   Defendants are actively engaged in trade and commerce in the State of Florida.

260.   Plaintiffs and its insureds are "consumers" as defined by Fla. Stat. § 501.203.

261.   In each claim described in Exhibits 8-17, Defendants engaged in deceptive, unfair, and unconscionable acts or trade practices in the conduct of trade and commerce in the pursuit and execution of their Scheme to Defraud

Plaintiffs and in violation of the FDUTPA.

262.   Defendants' bills, medical records, and supporting documentation submitted to Plaintiffs in connection with Defendants' Scheme to Defraud Plaintiffs were fraudulent in that they misrepresented that Defendants' DME was lawfully provided and billed. Defendants' false and fraudulent statements of material fact and acts of fraudulent concealment include but are not limited to: (i) Defendants' fraudulent and intentional coding as alleged herein, for DME units, supplies and equipment, and resupplies; (ii) Defendants' fraudulent and intentional unbundling of billing codes to separately bill Plaintiffs for TENS/NMES units and supplies; (iii) Defendants fraudulently, automatically, and systematically provided and invoiced unbundled resupplies to patients and billed Plaintiffs for the same; (iv) Defendants knowingly and intentionally sent the false, misleading, and inaccurate bills to Plaintiffs and others.

263.   Such fraudulent acts and practices offend public policy and are immoral, unethical, oppressive, unscrupulous, and would likely mislead a reasonable consumer.

264.   Defendants' conduct was the actual and proximate cause of the damages sustained by Plaintiffs.

265.   Defendants' unfair and deceptive acts caused Plaintiffs to sustain damages of at least $1,588,443.31 by paying claims for which there was no obligation to pay.

266.   By reason of Defendants' conduct, Plaintiffs are entitled to recover

costs, and attorneys' fees pursuant to Fla. Stat. § 501.211 (2) and Fla. Stat. § 501.2105 (1).

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, interest thereon, attorneys' fees, and costs, and any and all other additional relief this Court finds just and equitable and warranted by applicable law.

### COUNT VII
### (Against All Defendants)
### FLORIDA COMMON LAW FRAUD

267. Plaintiffs incorporate, as fully set forth herein, each and every allegation in paragraphs 1 through 266 above of this Complaint.

268. Defendants, EMSI and Mr. Garcia, intentionally and knowingly made false and fraudulent representations of material fact to Plaintiffs and concealed material facts from Plaintiffs in the course of their submission of fraudulent bills from EMSI as part of their Scheme to Defraud Plaintiffs, including that which is described throughout paragraphs 1 through 266.

269. Defendants false and fraudulent statements of material fact and acts of fraudulent concealment include but are not limited to: (i) Defendants' fraudulent and intentional use of improper codes for DME units, supplies and equipment, and resupplies; (ii) Defendants' fraudulent and intentional unbundling of billing codes to separately bill Plaintiffs for TENS/NMES units, supplies, and resupplies; (iii) Defendants' fraudulently, automatically, and

systematically provided and invoiced unnecessary and unbundled resupplies to patients and billed Plaintiffs for the same; (iv) Defendants knowingly and intentionally sent the false, misleading, and inaccurate bills to Plaintiffs and others. Defendants sent the false, misleading, and inaccurate bills to various individuals, including personal injury attorneys, defense attorneys and insurance companies including Plaintiffs.

270. Defendants knew their statements were false and fraudulent as evidenced by its occasional proper coding. In addition, Defendants were the subject of many prior lawsuits making substantially similar accusations of fraudulent billing practices. Furthermore, Plaintiffs met with Defendants' counsel to try to resolve these issues prior to filing suit and illustrated the fraudulent activities Defendants had been engaged in over the years, yet rather than correct their unlawful and fraudulent business practices, Defendants continue to make these same false and fraudulent misrepresentations in the course of their billing to Plaintiffs today.

271. Defendants intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce Plaintiffs to pay charges submitted by Defendants for DME, supplies, and resupplies, allegedly provided to patients making claims submitted to Plaintiffs that were not reimbursable.

272. Plaintiffs justifiably relied on these false and fraudulent

representations and acts of fraudulent concealment, made by the Defendants as described in this Complaint, including but not limited to the representations described throughout paragraphs 1 through 266, in making payment to Defendants and others by way of reasonable reliance and in the belief that treatment, services, and DME units, supplies, and equipment, and resupplies, as reflected in the documentation were accurate and reimbursable under applicable law, and provided in accordance with applicable law and the records reflected true medical conditions, complaints, and injuries.

273. As a proximate result, Plaintiffs have been injured as set forth above and described throughout this Complaint in their business and property by reason of the above-described conduct in that Plaintiffs have paid at least $1,588,443.31 to Defendants pursuant to fraudulent bills submitted or caused to be submitted, by Defendants that Defendants were not lawfully entitled to receive.

274. Defendants' false and fraudulent representations were made with malicious intent, vindictiveness, and wanton disregard for the rights of Plaintiffs, and with the intent to harm Plaintiffs. Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, punitive damages, attorneys'

fees, together with interest and costs, and any and all other additional relief this Court finds just and equitable and warranted by applicable law.

**COUNT VIII**
**(Against All Defendants)**
**UNJUST ENRICHEMENT**

275.   Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 274 of this Complaint.

276.   In each claim described in Exhibits 8-17, Plaintiffs conferred a benefit upon Defendants by paying money to EMSI.

277.   Plaintiffs' payments to EMSI were distributed to Mr. Garcia, as the owner of EMSI, which allowed him to profit from the payment of Plaintiffs' comprehensive insurance coverage benefits.

278.   Accordingly, Defendants are jointly and severally liable for the foregoing claims submitted to Plaintiffs because they each played an essential role acting in concert to further Defendants' Scheme to Defraud Plaintiffs.

279.   Plaintiffs made payments to Defendants by way of reasonable reliance and in belief of the accuracy of the medical records created and submitted or caused to be submitted by Defendants. Plaintiffs reasonably believed they were legally obligated to make such payments based on Defendants' improper, unlawful, and unjust acts.

280.   Plaintiffs have been unjustly harmed by billing misrepresentations and paid for services that Defendants were not otherwise entitled to payment

for.

281.   Defendants retained Plaintiffs' payments in violation of fundamental principles of justice, fairness, equity, and good conscience.  These monies were obtained in violation of applicable Florida law as Defendants submitted false and misleading claims documentation to Plaintiffs.

282.   Defendants have been unjustly enriched, at Plaintiffs' expense by Plaintiffs' payments which constituted a benefit that Defendants voluntarily accepted and retained notwithstanding their improper, unlawful, and unjust billing schemes.

283.   Since Defendants knowingly submitted (or caused to be submitted) to Plaintiffs charges for services that were not lawful when they were rendered nor were they owed under the applicable insurance policy, the circumstances are such that it would be inequitable to allow Defendants to retain the benefit of the monies paid.

284.   By reason of the above, and as a direct and proximate result of the above described conduct, Plaintiffs have been damaged and Defendants have been unjustly enriched by more than $1,319,817.57.

285.   As such, by virtue of the foregoing, Plaintiffs are entitled to compensatory damages, together with interest and costs, and other relief the Court deems just and appropriate.

WHEREFORE, Plaintiffs pray this Court enter Judgment in favor of the

Plaintiffs and against all Defendants, jointly and severally, for an amount exceeding $150,000, for compensatory damages, at least up to disgorgement of profits obtained via the wrongful conduct set forth herein, interest thereon, attorneys' fees, and costs and grant such other relief as the Court finds just, equitable and warranted by applicable law.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

**WHEREFORE**, Plaintiffs respectfully prays that the Court enter judgment in their favor against Defendants as follows:

1. Injunctive and declaratory relief;

2. Ordering Defendants to reimburse Plaintiffs for the money Plaintiffs have paid due to Defendants' Scheme to Defraud Plaintiffs;

3. Ordering that any and all outstanding balances purportedly owed by Plaintiffs to Defendants are not compensable as a matter of law;

4. Ordering Defendants to compensate the amounts that Defendants have been unjustly enriched by the misconduct underlying this Complaint;

5. Awarding Plaintiffs interest and costs, including attorneys' fees; and

6. Awarding Plaintiffs such other and further relief as the Court deems just.

Respectfully submitted,

By:___/s/ Holly Galinskie_____

HOLLY C. GALINSKIE, ESQ.
Law Offices of Ignacio M. Sarmiento
Two Datran Center - Suite 1520
9130 S. Dadeland Boulevard
Miami, FL 33156
Telephone: (561) 226-2553
Attorney for Defendant, Liberty Mutual
Insurance Company
MiamiLegalMail@LibertyMutual.com
holly.galinskie@libertymutual.com


By:_____/s/ Steven Schuetz_____

Pro Hac Vice
STEVEN SCHUETZ, ESQ.
Law Offices of Cozzi, Marek & Parker
225 W. Washington, Suite 500
Chicago, IL 60606
Telephone: (312) 619-5022
Attorney for Defendant, Liberty Mutual
Insurance Company
Steven.Schuetz@LibertyMutual.com
Meachum@LibertyMutual.com


And

By:_____/s/ Jeffrey G. Rapattoni_____
        /s/ Jonathan Magpantay

Pro Hac Vice
JEFFREY G. RAPATTONI
JONATHAN MAGPANTAY
15000 Midlantic Drive
Suite 200
P.O. Box 5429
Mount Laurel, NJ 08054
Direct: (856) 414-6076
jgrapattoni@mdwcg.com
JCMagpantay@MDWCG.com